# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| In re: | ) | |
|     **STONY POINT LAND, INC.** | ) | **Case No. 10-31740-KRH** |
|         Debtor. | ) | **Chapter 11** |
| | ) | |
| **THOMAS R. HUBBARD** | ) | |
| **and** | ) | |
| **KATHERINE HUBBARD,** | ) | |
|         Plaintiffs, | ) | |
| | ) | |
| **v.** | ) | **Adversary Proceeding No.** |
| | ) | **10-03107-KRH** |
| **STONY POINT LAND, INC.,** | ) | |
|         Defendant. | ) | |

## STONY POINT LAND, INC.'S
## <u>TRIAL BRIEF REGARDING ADVERSARY PROCEEDING</u>

Defendant Stony Point Land, Inc. ("Stony Point"), by special counsel, submits the following trial brief in this adversary proceeding, which was removed from the Circuit Court of the City of Richmond (the "State Court") on June 9, 2010.

This case concerns an attempt by Thomas R. and Katherine P. Hubbard, the plaintiffs, to avoid their obligations under a real estate contract that they signed prior to the downturn in the economy. The contract (copy attached as Exhibit A) was signed September 21, 2006. It provides for the Hubbards to purchase an expensive lot in a high-end subdivision to be developed on the James River in Richmond ("Riverwatch") by Stony Point.

Because the parties did not know when the subdivision's infrastructure would be

---

John K. Burke, Jr. (VSB No. 16798), john.burke@troutmansanders.com
Andrea M. Sullivan (VSB No. 41944), andrea.sullivan@troutmansanders.com
Jon S. Hubbard (VSB No. 71089), jon.hubbard@troutmansanders.com
Troutman Sanders LLP
P.O. Box 1122 | 1001 Haxall Point
Richmond, Virginia 23218-1122
(804) 697-1210 | fax: (804) 698-5105
*Special Counsel to the Debtor*

completed, the contract (§ 5) allowed closing to occur at any time, but in no event later than ten days after the Hubbards received notice that Stony Point had completed the Phase One Infrastructure. As contemplated by the contract, Stony Point could not begin constructing the infrastructure until the City had issued the necessary permits. For reasons beyond Stony Point's control, the City did not issue the permits until January 25, 2007. Construction began immediately thereafter. The City approved Riverwatch's final subdivision plat on February 23, 2007, and closing could have occurred at any point after that date. Construction of the Phase One Infrastructure was completed on December 6, 2008.

In recognition of the hilly terrain and other challenges for establishing the subdivision, Section 15 of the contract allowed Stony Point to terminate it if, at any point prior to the start of the construction of the Phase One Infrastructure, Stony Point determined for any reason that it would not develop the subdivision or that material changes in the subdivision plat were necessary or desirable, or if, following commencement of construction of the Phase One Infrastructure, Stony Point encountered unforeseen circumstances that rendered development of the subdivision economically infeasible as determined by Stony Point. Significantly, *the contract does not provide termination rights to the plaintiffs*.

Nevertheless, after the economy soured the Hubbards decided to avoid their obligations under the contract because, they claim, it took Stony Point an "unreasonable" length of time to make "delivery" of the lot. *See* Complaint, Count II, ¶ 3 (copy attached as Exhibit B; also is dkt. no. 1-1). Contrary to the Hubbards' allegations, and as the contract states, closing could have occurred at any time after the City issued the permits and approved the subdivision plat. Thus, the lot was ready for "delivery" on February 23, 2007. Under the contract, however, the Hubbards were not *required* to close until ten days after notice of completion of the Phase One

Infrastructure, which required, among other things, extensive excavation and site work, road construction, curbing and storm control structures, and the extension of utility lines (water, electricity, gas, cable television).

In addition, the Hubbards also sought to avoid the contract on the ground that they allegedly never received the homeowners' association disclosure packet pursuant to former Va. Code § 55-511. *See* Complaint, Count I, ¶ 5 (Ex. B; dkt no. 1-1).

In its Answer and Counterclaim (copy attached as Exhibit C; also is dkt no. 1-2), Stony Point has denied that it breached the contract and seeks a judgment ordering the Hubbards to specifically perform their obligations under the contract, including but not limited to payment to Stony Point of the contract price of $450,000, less the deposit of $45,000.

It is no mystery why the Hubbards seek to avoid the contract: not only has the real estate market soured since the contract was signed in September 2006, but as of March 2010, and perhaps even now, they still own the house in the State of Washington that they lived in when they signed the contract, as well as a condominium and a home they purchased in Richmond to live in while they were constructing a house in Riverwatch. However, changes in market conditions do not entitle the Hubbards to avoid their obligations under the contract, and this Court should enter a decree in favor of Stony Point requiring the Hubbards to specifically perform their obligations under the contract, as demanded in Stony Point's Counterclaim.

## PRIOR RULINGS IN THIS CASE BY THE STATE COURT

The State Court has made certain rulings regarding the claims in this adversary proceeding.

First, the Court found in its Opinion and Order of September 29, 2009 (attached as Exhibit D; also is dkt. no. 01-25), that the required documentation was delivered to the Hubbards

no later than August 27, 2008, and that they did not attempt to cancel within three days of that date, and therefore that Count I of the Complaint failed as a matter of law. The Court also held that the deliveries of the disclosure packet prior to incorporation of the homeowners' association were ratified by the association's later incorporation, and that delivery of an allegedly defective packet still triggers the three-day cancellation period under the Act.

Later, the Court denied Stony Point's Motion for Partial Summary Judgment and in Limine Regarding Count II of the Complaint. *See* Order (Oct. 8, 2009) (attached as Exhibit E; also is dkt. no. 01-31). In that Motion, Stony Point had asserted that no "reasonable delivery" requirement applied.

Thus, the remaining claims in this case are the Hubbards' breach of contract claim (contained in Count II of their Complaint) and Stony Point's claim for specific performance (contained in Count I of its Counterclaim).[1]

## FACTS

The evidence at trial will show as follows and as discussed above.

1.  The demand for lots in Riverwatch was high.

In the summer of 2006, the plaintiffs, who were then living in the State of Washington, determined to move to Richmond, where Mrs. Hubbard grew up. At that time, there was a robust real estate market in Richmond, and Stony Point was in the early stages of developing Riverwatch, a thirteen-lot residential subdivision on a bluff overlooking the James River. Even though Stony Point had not yet received final subdivision plat approval from the City of Richmond, and even though the asking price for the lots was $375,000 to $550,000, demand for

---

[1]     *See* Stipulations (filed by the parties in this Court on December 23, 2010) ¶ 12. Also, on March 12, 2010, Stony Point nonsuited its alternative claim for damages for breach of contract contained in Count II of its Counterclaim. *Id.* ¶ 10.

the lots was high.  Because of the competition for the best lots, the Hubbards signed a contract to purchase Lot 4 for the sum of $450,000, *even though neither Mr. or Mrs. Hubbard had ever visited the lot or the subdivision.*

2.  The Contract

Because Stony Point had not even received final subdivision plat approval from the City, and because it was unknown exactly when the infrastructure for the subdivision could be completed, Section 5 of the contract did not specify a date certain for closing, but rather closing could occur at any time "not later than ten (10) days following receipt by Purchaser of notice from Seller that Seller has completed the Phase One Infrastructure (as hereinafter defined.)"  The Phase One Infrastructure was defined in Section 8 of the contract to consist of "improvements necessary for issuance by the City of permits for the construction of a residential dwelling on lots within the Subdivision, including (i) a road providing access to the Lot from Cherokee Road and an emergency access road as required by the City, each as shown on the Subdivision Plat ... and (ii) the extension of gas, water, sanitary sewer, electric, telephone and cable utilities to the Lot." Section 8 also provided that the Seller was to commence construction of the infrastructure "as soon as practicable after issuance of the required permits by the City[.]"

As discussed above, Section 15 of the contract provided that Stony Point could terminate the contract prior to the start of the construction of the Phase One Infrastructure if Stony Point determined not to develop the subdivision, that material changes in the subdivision plat were necessary or desirable, or that development was no longer economically feasible.  On the other hand, the contract does not provide termination rights to the plaintiffs, for any reason.

3.  Construction of the infrastructure.

As contemplated by the contract, Stony Point could not begin construction of the infrastructure until the issuance of the necessary permits by the City.  For reasons beyond

the control of Stony Point, the City did not issue the necessary permits until January 25, 2007. Construction began immediately thereafter.

The evidence presented at trial will show that, although Stony Point diligently pursued completion of the Phase One Infrastructure, numerous problems beyond the control of Stony Point occurred (which, although not foreseen by Stony Point, are not unusual in construction projects), including, but not limited to, the following:

- Although portions of the property had been tested for rock deposits prior to the beginning of construction, substantial deposits of rock were discovered in areas in which it was previously thought rock would not be located. This caused a significant delay, and necessitated blasting activities by Stony Point to remove the rock, which was interfering with the completion of the necessary road and emergency road. The presence of rock caused at least a six-week delay.

- The area in which Riverwatch is located was formerly a part of Chesterfield County which was annexed by the City. During the work to install the necessary sanitary sewer line, conditions were discovered in Cherokee Road that were unknown to Stony Point, and even the City. These unforeseen conditions required redesign of the sanitary sewer system, which required approvals by the city after the project was underway. This caused a delay of over two months.

- Due to unanticipated drainage conditions, in early 2008, the City required a partial re-design of the water line to serve Riverwatch which Stony Point had to construct as part of the Phase One Infrastructure. This caused a delay of several weeks.

- In the summer of 2008, the City determined that, due to the hilly topography, it would be necessary to change the location of its natural gas lines from outside of the curb of the subdivision's main road to the centerline of the road. As a result, paving of the road was put on hold until plans could be revised and the installation of the gas facilities could be completed. The pavement delay occurred at the time of significant rainfall, which, combined with the steep slope of the road, caused extensive washout and undermined the recently installed curbing, which had to be replaced.

- Record rainfall occurred during the construction of the infrastructure, particularly during the spring of 2008. (It was reported in the Richmond Times Dispatch that April 2008 was the third wettest April on record.) As a result, it was necessary for additional erosion and soil control work to be performed, and the City actually stopped work on several occasions due to erosion and soil control problems caused by the record rainfall.

- Finally, and in a reversal of its informal policy prior to the summer of 2008, Dominion Virginia Power required that the foundation of the subdivision's first house had to be in

place before Dominion would begin installing electric lines to the subdivision. This caused a delay of approximately four months (August – December, 2008).

The Hubbards did not move to Richmond until August, 2007, and because of their delayed move, they were initially pleased that the construction of the infrastructure had been delayed. The Hubbards initially bought a condominium in which to reside while the infrastructure was being completed, and then purchased and moved into a large house, in which they intended to live while the infrastructure was being completed and their house was being built on Lot 2. It was not until May, 2008 that the Hubbards first registered any displeasure regarding the length of time it was taking to complete the infrastructure.

It was not until August 28, 2008, that the Hubbards first took the position that the length of time it had taken to complete the infrastructure was unreasonable and that they did not have to perform their obligations under the contract. In a letter dated December 6, 2008, Stony Point advised the Hubbards that the Phase One Infrastructure had been completed and that they should prepare for closing within ten days of December 6, 2008. On or about January 5, 2009, the Hubbards filed their Complaint in the State Court for the claims at issue here.

ARGUMENT

Virginia law applies to this case. *See, e.g.*, *Ambrose Branch Coal Co. v. Tankersley*, 106 B.R. 462, 466 (W.D. Va. 1989) ("[T]he *Erie* doctrine applies, whatever the ground for federal jurisdiction, to any issue or claim which has its source in state law.").[2]

I.      The Hubbards, as the plaintiffs, bear the burden of proof to establish their case.

The Hubbards have the burden of proof in this case. *E.g.*, *Brooks v. Worthington*, 206

---

[2]      *See generally* *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). *Cf. Comm'r v. Stern*, 357 U.S. 39, 45 (1958) (even where the federal government is the creditor on a tax matter, applying state law and stating "until Congress speaks to the contrary, the existence and extent of liability should be determined by state law").

Va. 352, 359, 143 S.E.2d 841, 847 (1965) ("the burden of proof is always on the plaintiff to establish his case …. The duty of going forward with the evidence shifts to the defendant only when the plaintiff has established his case by evidence, but the burden of proof never shifts"); *Nosay v. Owens*, 193 Va. 343, 349, 68 S.E.2d 531, 535 (1952) ("the burden always rests upon the plaintiff to establish his case"); *Hall v. Hall*, 181 Va. 67, 80, 23 S.E.2d 810, 815 (1943) ("the necessity of proving his case always rests upon the plaintiff and never shifts").

Stony Point's position is that there is no "reasonable time" term in the contract. *See* Dkt. nos. 01-24 & 01-28 (Stony Point's memoranda submitted in support of its Motion for Partial Summary Judgment and in Limine Regarding Count II of the Complaint). However, the State Court denied Stony Point's Motion, concluding that there should be an implied term of reasonable delivery and that there were material facts genuinely in dispute. Even with such an implied term, however, the Hubbards must still prove that the time it took to complete the Phase One Infrastructure, in light of all of the facts and circumstances of this case (*see* § III(B), *infra*), was unreasonable. *E.g.*, *Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275 (3d Cir. 2000) (where plaintiffs alleged that Dow had breached a contract by failing to complete an environmental cleanup within a reasonable time, affirming the grant of summary judgment against the plaintiffs because plaintiffs "bear the burden of proof on this issue at trial, to show that a reasonable time has expired," and there was no evidence from which a jury could find that a reasonable time was less than 14 years); *see also* § I, *supra* (a plaintiff bears the burden to establish his claims).

II.    That the Hubbards entered into a valid and binding contract is undisputed, so unless they establish a defense, Stony Point is entitled to judgment in its favor on its Counterclaim to enforce the contract.

That the parties entered into a valid and binding contract has been alleged and admitted

by both the Hubbards and Stony Point and therefore is conclusively established in this action. *See* Complaint ¶ 1 (Ex. B; dkt. no. 1-1); Answer ¶ 1 and Counterclaim ¶ 3 (Ex. C; dkt. no. 1-2); Answer to Counterclaim ¶ 2 (Ex. F; dkt. no. 1-3).

The Phase One Infrastructure was completed by December 6, 2008 (Complaint, Count II, ¶ 2; Answer ¶ 10), but the Hubbards have refused to close. Unless the Hubbards establish a defense or excuse for their non-performance, Stony Point must prevail on its Counterclaim.

III.  **The Hubbards' sole remaining excuse for nonperformance is that there was an unreasonable delay.**

   A.  Determining what is a reasonable time requires a case-specific inquiry that must take into account all relevant circumstances, including the difficulties that Stony Point encountered.

Under Virginia law, all of the facts and circumstances in this particular case, including the difficulties Stony Point encountered, must inform the determination of whether the Hubbards have proven that a reasonable time expired before they were notified that closing must occur.

   1.  What constitutes a reasonable time depends on all the facts and circumstances of a particular case.

Recognizing that "[w]hat is a reasonable time is a very indefinite term, varying as to the act to be done and the circumstances of the particular act," *Virginia Hot Springs Co. v. Schreck*, 131 Va. 581, 585, 109 S.E. 595, 597 (1921), courts in Virginia have held uniformly that a fact finder trying to determine what constitutes a reasonable time must look at all the facts and circumstances of a particular case. *E.g.*, *Plaskitt v. Black Diamond Trailer Co.*, 209 Va. 460, 467-68, 164 S.E.2d 645, 650-51 (1968) ("What is a reasonable time depends on the nature, purpose and circumstances of the action to be taken."); *Adams v. Doughtie*, 63 Va. Cir. 505, 526 (Portsmouth 2003) ("What constitutes a reasonable time depends on the situation of the parties, the nature of the transaction, and the facts of the particular case."); *F. L. Hall, Inc. v. Warehouse*

*Landing Assocs.*, 38 Va. Cir. 181, 183 (Northumberland 1995) ("In determining what is a reasonable time, 'the circumstances to be considered have a wide range: they include the nature of the proposed contract, the purposes of the parties, the course of dealing between them, and any relevant usages of trade….'") (citing RESTATEMENT (2D) OF CONTRACTS (1979) § 41 cmt. b); *accord United States v. 2974.49 Acres of Land*, 308 F.2d 641, 643 (4th Cir. 1962) (holding that "in the determination of what constitutes a reasonable time … the nature of the subject matter, the object of the contract and the situation and conduct of the parties and all other circumstances should be taken into consideration."); 17A AM. JUR. 2D, *Contracts* § 468.

      2.      This case involves a lot purchase and construction contract, in which delays are common – especially when the entire development is in its earliest stages.

This case involves a contract for the sale of a lot in a to-be-developed subdivision. Such contracts often run into delays, and the fact that this development was at a very early stage when the contract was signed made delay both more likely and not at all unreasonable. *E.g.*, *Lajayi v. Fafiyebi*, 860 A.2d 680, 688 (R.I. 2004) ("generally, in contracts for the sale of land, payment or conveyance at the exact time specified in the agreement is not required because 'the injury caused by delay is little or nothing. Delays are frequent in these transactions; and it is the custom of [people] to overlook them, even though they may have stated in advance that they would not.'"); 14-81 POWELL ON REAL PROPERTY § 81.03[5] (Matthew Bender / LexisNexis 2009) ("The same complexities of real estate transactions that prevent contemporaneous execution of the agreement and its immediate performance also cause a lack of certainty in setting a closing date with precision. Each party has numerous tasks to complete before final performance can be accomplished."); *see also Kalinowski v. Yeh*, 847 P.2d 673, 677 (Haw. Ct. App. 1993); 3A A. CORBIN, CORBIN ON CONTRACTS § 716 at 367 (1951)).

The evidence at trial will show numerous factors that must inform the determination of whether finishing the Phase One Infrastructure less than two years from receipt of the permits exceeded a reasonable time. Riverwatch required, among other things, extensive excavation and site work, road construction, curbing and storm control structures, and the extension of utility lines (water, electricity, gas, cable television), and as stated on page 5 above and discussed below, there were a number of unforeseen circumstances that were beyond Stony Point's control. Mark Kukoski, who is an expert in land development and who has studied the development of Riverwatch, will testify that in his opinion Stony Point did not take an unreasonable length of time to complete the Phase One Infrastructure. Significantly, the plaintiffs will not call any expert to rebut Mr. Kukoski's testimony.

3.   A "reasonable time" requirement does not apply to matters <u>outside the performing party's control.</u>

Even if there is a "reasonable time" requirement, it would apply only to matters within the control of Stony Point.

In *Ryland Group, Inc. v. Wills*, 229 Va. 459, 331 S.E.2d 399 (1985), an option contract obligated the seller to do certain development work, but the contract contained no deadline for completion of that work or for settlement on the lots under option. The trial court sustained a demurrer on the grounds that the contract violated the rule against perpetuities. The Supreme Court reversed, holding that the rule was not violated. The Court explained that the facts reflected the parties' intent to impose a "reasonable time" requirement and applied "the settled principle that contract terms *under the control of the parties* must be performed within a reasonable time where the contract does not specify the time of performance." *Id.* at 467, 331 S.E.2d at 404 (emphasis added). The Court distinguished a past case (*United Virginia Bank v. Union Oil*, 214 Va. 48, 197 S.E.2d 174 (1973)) not only based on that case's facts but on the

legal grounds that the contingency there depended on action by a municipality – an entity outside the control of the parties and whose action was not certain to take place within 21 years. *See Wills*, 229 Va. at 466-67, 331 S.E.2d at 404 (if the parties had intended a reasonable time requirement in *United Virginia Bank*, "such intent of the parties, had it existed," could not have "control[led] a contingency to be performed by a party who was not privy to the agreement").

Here, the evidence will show that completion of the Phase One Infrastructure depended in large part on the actions of parties not subject to the agreement and other matters outside the control of the parties to the agreement. Among other things, the City had to issue permits, the City required a redesign of the water line and changed the location of a gas line, there was record rainfall in the spring of 2008, and Dominion Virginia Power had to provide power service. Accordingly, the Hubbards' claim of breach of a "reasonable delivery" requirement fails.

IV.    Stony Point is entitled to specific performance if the Hubbards fail to prove
       their defense to Stony Point's Counterclaim.

"Under [11 U.S.C. § 105(a)], the bankruptcy courts have injunctive powers which include the power to issue a decree of specific performance of a contract." *Stokes v. Firestone (In re Stokes)*, 198 B.R. 168, 175 (E.D. Va. 1996).

"Although the granting of specific performance is discretionary and not an absolute right, *if the contract sought to be enforced is proved and is in its nature and circumstances unobjectionable, a court of equity should decree specific performance as a matter of course*." *Allen v. Lindstrom*, 237 Va. 489, 497, 379 S.E.2d 450, 455, *cert. denied*, 493 U.S. 849 (1989) (emphasis added); *accord Yamada v. McLeod*, 243 Va. 426, 432-33, 416 S.E.2d 222, 226 (1992). *See also City of Manassas v. Board of County Supervisors*, 250 Va. 126, 134, 458 S.E.2d 568, 571 (1995) ("Although it is not a matter of absolute right, 'where the contract sought to be enforced is proved and is in its nature and circumstances unobjectionable, it is as much a matter

of course for courts of equity to decree specific performance as it is for a court of law to give damages for a breach of it.'"); *Haythe v. May*, 223 Va. 359, 361, 288 S.E.2d 487, 488 (1982) (same); *Pavlock v. Gallop*, 207 Va. 989, 995, 154 S.E.2d 153, 157 (1967) (same).

Moreover, as this Court has noted, citing the above wealth of case law, "contracts involving the sale of land have always enjoyed a particular amenability to specific performance under Virginia law." *Stokes*, 198 B.R. at 180.

That courts can order specific performance in favor of sellers of real estate is also well-established in Virginia. *See Yamada*, 243 Va. at 432-33, 416 S.E.2d at 225-26 (rejecting the argument that the availability of damages precluded granting specific performance, and affirming an order requiring real estate purchasers to specifically perform the contract); *Cogito v. Dart*, 183 Va. 882, 33 S.E.2d 759 (1945) (affirming an award in favor of a real estate seller and compelling specific performance from the buyer); *Goins v. Garber*, 131 Va. 59, 108 S.E. 868 (1921) (same); *Dunn v. Stowers*, 104 Va. 290, 51 S.E. 366 (1905) (same); *Farris v. Hughes*, 89 Va. 930, 17 S.E. 518 (1893) (same); *Ayres v. Robins*, 71 Va. (30 Gratt.) 105, 115-16 (1878) (same); *Fauber v. Whitten*, 35 Va. Cir. 527, 529 (Bedford 1993) (overruling a purchaser's demurrer to a seller's prayer for specific performance because "The Supreme Court of Virginia has previously approved the use of specific performance to require a purchaser to perform a written contract of purchase," citing *Yamada* and *Ayres*); *Ferebee v. Andre*, 31 Va. Cir. 243, 248 (Louisa 1993) (granting specific performance to the sellers and stating "Under Virginia law, both the purchaser and vendor in a contract for the purchase and sale of real estate are entitled to the remedy of specific performance for a breach."); *see also Roland v. Levin (In re Roland)*, Case No. 96-27648, APN 97-2234, 1998 Bankr. LEXIS 219 at 23-24 (Bankr. E.D. Va. Feb. 18, 1998) (concluding that "specific performance is an available remedy" against a purchaser that tried to

back out of a real estate contract).

Allowing sellers to obtain specific performance "serves two important purposes, since it affords the vendor a complete remedy, while at the same time complying with the principle of mutuality that compels a court of equity to extend the potential benefits of any remedy equally to both sides." *Id.*; *accord Ayres*, 71 Va. at 115-16; 17 MICHIE'S JUR. OF VA. AND W.VA., *Specific Performance* § 23 (2006 repl. vol. with 2008 suppl.) at 38-39. In fact, only specific performance provides complete relief. *See Ayres*, 71 Va. at 115:

> an action at law by the vendor against the purchaser on an executory contract for sale to recover the purchase money due him, does fall short of what he is entitled to. It does not reach the whole mischief and secure the whole right of the vendor in a perfect manner…. He is entitled under his contract to more perfect relief…. [Specific performance] is executing the contract fully, according to the agreement and intention of the parties, and this only is giving adequate relief, doing complete justice in the case.

*See also Yamada*, 243 Va. at 433, 416 S.E.2d at 226 (the two reasons for granting specific performance in *Ayres* were "to give the seller … complete relief" and "to comply with the principle of mutuality that compels courts of equity to give [the parties] the same relief").

<u>CONCLUSION</u>

For the reasons stated above, plaintiffs should not be allowed to escape their contractual obligations, and this Court should enter a decree requiring plaintiffs to specifically perform and close on the purchase of Lot 2 and to pay interest on the purchase price from December 16, 2008.

Dated: December 23, 2010        Troutman Sanders LLP
                                   Special Counsel to Stony Point, Inc.

                                   By:    /s/ Jon S. Hubbard
                                               Counsel

John K. Burke, Jr. (VSB No. 16798)
Andrea M. Sullivan (VSB No. 41944)

Jon S. Hubbard (VSB No. 71089)
Troutman Sanders LLP
P.O. Box 1122
1001 Haxall Point
Richmond, Virginia 23218-1122
(804) 697-1210
(804) 698-5105
john.burke@troutmansanders.com
andrea.sullivan@troutmansanders.com
jon.hubbard@troutmansanders.com

 *Special Counsel to the Debtor*

## CERTIFICATE OF SERVICE

  I hereby certify that a true copy of the foregoing Defendant's Trial Brief has been

sent by first-class mail, postage paid, to

   Stephen C. Conte
   Blackburn, Conte, Schilling & Click, P.C.
   300 West Main Street
   Richmond, Virginia 23220-5630

   Donna J. Hall
   Samuel I. White, P.C.
   5040 Corporate Woods Dr., Suite 120
   Virginia Beach, VA 23462

on this 23d day of December, 2010.

         _____ /s/ Jon S. Hubbard _____

2009026v3